# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RONALD L. ESKRIDGE, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 07-064-SLR |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

Angela Pinto Ross of Doroshow, Pasquale, Krawitz, Siegel & Bhaya, Wilmington, Delaware. Attorney for Plaintiff.

Patricia Anne Stewart and Dina White Griffin of the Social Security Administration, Philadelphia, Pennsylvania. Attorneys for Defendant.

## MEMORANDUM OPINION

Dated: August 7, 2008
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Ronald L. Eskridge, Jr. ("plaintiff") appeals Michael Astrue's, the Commissioner of Social Security ("defendant"), decision to deny his application for disability insurance benefits under Title VII of the Social Security Act, 42 U.S.C. §§ 401-433. Plaintiff has filed a motion for summary judgment asking the court to remand the case to the Commissioner with instructions to award benefits or, alternatively, for further proceedings. (D.I. 9) Defendant has filed a cross-motion for summary judgment requesting the court to affirm his decision and enter judgment in his favor. (D.I. 12) The court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).

## II. BACKGROUND

### A. Procedural History

On January 2, 2004, plaintiff filed an application for disability insurance benefits alleging disability beginning on December 3, 2003. (D.I. 7 at 53) Plaintiff asserted disability due to "[p]artial amputated foot; type I diabetes; high blood pressure; renal disease; and neurological/circulatory problems." (Id. at 67) Defendant denied plaintiff's application first on April 13, 2004 and upon reconsideration on November 1, 2004. (Id. at 15) Plaintiff requested a hearing that was held before the administrative law judge ("ALJ"), Judith A. Showalter, on March 3, 2006. (Id. at 15, 23) Mitchell A. Schmidt ("Schmidt"), a vocational expert ("VE"), testified at the hearing. (Id. at 15)

On May 22, 2006, the ALJ issued a decision that found plaintiff not disabled and denied his claim for disability insurance benefits. (Id. at 15-23) The ALJ decision

became final after the appeals council, on December 15, 2006, denied plaintiff's request to review the hearing decision. See 20 C.F.R. §§ 404.955, 404.981 (2007); see also Sims v. Apfel, 530 U.S. 103, 105-06 (2000); Matthews v. Apfel, 239 F.3d 589, 592 (3d Cir. 2001). Plaintiff filed the present action on February 1, 2007. (D.I. 1)

## B. Medical History

### 1. Dr. M. James Lenhard

Plaintiff was born on July 1, 1959 (D.I. 7 at 395) and was diagnosed at age fifteen with type 1 diabetes (id. at 175). Plaintiff's medical records indicate that Dr. M. James Lenhard ("Dr. Lenhard"), an endocrinologist (id. at 144), has treated plaintiff for his type 1 diabetes since 1997 (id. 140-210).[1] A letter written by Dr. Lenhard on September 10, 1997 stated that plaintiff "had type I diabetes with unclear control" and a background of retinopathy,[2] severe peripheral neuropathy,[3] hypertension, and severe diabetic nephropathy.[4] (Id. at 175-76) Plaintiff's medical records also show that he began to see Dr. Lenhard for regularly scheduled treatments beginning in February 2001. (Id. at 146-73)

Plaintiff was hospitalized from November 25, 2003 to December 5, 2003 at the

---

[1]Although plaintiff was a patient of Dr. Lenhard's since 1997, the record shows that he did not avail himself of treatment for his type I diabetes and was a "no show" for three appointments in the time period from 1997 to 1999. (See D.I. 7 at 174)

[2]Diabetic retinopathy is damage to the retina of the eye.

[3]Diabetic neuropathy is complication of diabetes involving small blood vessels that supply nourishment to nerves.

[4]Nephropathy is a type of kidney disease.

Christiana Care Hospital, Christiana, Delaware for "[d]iabetic ketoacidosis,[5] deep tissue infection, and [an] abscess of the right foot." (Id. at 224 (footnote added)) This absence led to the "amputation of [his] right fifth toe," during his hospital stay. (Id.) In addition, a magnetic resonance imaging ("MRI") scan indicated that plaintiff suffered from old and new metatarsal[6] foot fractures. (Id.) In a letter dated August 11, 2004, Dr. Lenhard wrote that plaintiff's "foot ulcer has healed up  .  .  .  [and] he still has reasonable control of his diabetes." (Id. at 146) Dr. Lenhard, further, wrote that plaintiff's metabolic problems included retinopathy, peripheral neuropathy, nephropathy, hypertension, hypercholestrolemia,[7] hyperhomocysteinemia,[8] obesity, anemia, and euthoid goiter.[9] (Id. at 146-47)

On September 19, 2004, Dr. Lenhard evaluated plaintiff and completed a residual functional capacity ("RFC") assessment questionnaire. (Id. at 142-45) Dr. Lenhard diagnosed plaintiff with type I diabetes with complications, and plaintiff's prognosis was fair. (Id.) Dr. Lenhard identified plaintiff's symptoms as fatigue, difficulty walking, episodic vision blurriness, infections, fevers, excessive thirst, swelling, general malaise, muscle weakness, retinopathy, kidney problems, insulin shock, insulin coma,

---

[5]Diabetic ketoacidosis is a life-threatening complication of untreated diabetes mellitus (hyperglycemia or chronic high blood sugar).

[6]Metatarsals are the five long bones of the foot.

[7]Hypercholestrolemia is an excessive amount of cholesterol in the blood.

[8]Hyperhomocysteinemia is an abnormally large level of homocysteine (a compound similar to an amino acid) in the blood.

[9]Euthoid goiter is an enlarged thyroid gland.

3

loss of manual dexterity, sweating, difficulty thinking, difficulty concentrating, and hyper/hypoglycemic attacks.  (Id.)  In addition, plaintiff's symptoms are "occasionally" severe enough to interfere "with [the] attention and concentration needed to perform simple work tasks."  (Id.)  Furthermore, Dr. Lenhard reported that plaintiff could tolerate only low stress jobs.  (Id. at 143)  Notably, Dr. Lenhard felt that it was not within his medical specialty to assess plaintiff's ability to walk, sit, stand, lift, or carry.  (Id. at 143-45)  The RFC assessment questionnaire prepared by Dr. Lenhard also indicated that plaintiff's impairments were "likely to produce 'good' and 'bad' days" and he was likely to miss work "as a result of impairments or treatment" more than four days per month.  (Id. at 145)  Due to nausea and vomiting, plaintiff again was admitted to the Christiana Care Hospital from December 10, 2004 to December 11, 2004, where he was diagnosed with mild diabetic ketoacidosis and diabetic gastroparesis.[10]  He was noted to have a chronic cough for many years, most likely caused by postnasal drip.  (Id. at 368-74)

On October 13, 2005, Dr. Lenhard, in a letter, wrote a short narrative ("narrative") to explain plaintiff's diabetic symptoms and employment capabilities to plaintiff's counsel:

> Despite Mr. Eskridge achieving and maintaining good to excellent glycemic control, his diabetic complications have progressed. This largely represents old damage that was done over the years before I was able to help him. At the present time, he has slowly advancing diabetic nephropathy. I anticipate that he will need dialysis in the future. The timing of this is not immediately clear but is probably measured in years

---

[10]Gastroparesis is partial paralysis of the stomach resulting in food remaining in the stomach longer than usual.

4

rather than in days or weeks. . . . Because of Mr. Eskridge's multiple medical problems, he has had a very difficult time trying to maintain a career. He has very labile blood sugars as often as someone with advanced diabetes. He suffers from frequent hypo- and hyperglycemia. He has chronic fatigue because of his anemia. . . . He has largely succeeded in stopping or slowing everything [over] which he has some control. . . .

(Id. at 344-45) Dr. Lenhard further opined that adjusting doses and the side effects of plaintiff's thirteen different medications alone was a full-time job. (Id.) Dr. Lenhard wrote that "because of [plaintiff's] multiple diabetic complications and the impending need for hemodialysis, [he] support[ed] [plaintiff's] ability to obtain [s]ocial [s]ecurity benefits and [he] support[ed] him in not working." (Id.)

### 2. Dr. David Maged

On October 29, 2004, plaintiff's primary family physician, Dr. David Maged ("Dr. Maged"), also completed a RFC assessment questionnaire. (Id. at 272-75) Dr. Maged diagnosed plaintiff with insulin dependant diabetes, asthma, sinusitis, hypertension, partial amputation of foot and opined that plaintiff's prognosis was poor. (Id. at 272) Dr. Maged identified similar symptoms as Dr. Lenhard, but he also included psychological problems and numbness and pain in plaintiff's extremity. (Id.) He, in contrast to Dr. Lenhard, did not list the impairments of difficulty walking, infections, fever, excessive thirst, loss of manual dexterity, sweating, difficulty thinking and difficulty concentrating. (Id.) Dr. Maged's opinion also differed from Dr. Lenhard's diagnosis in that plaintiff's pain or other symptoms "frequently" were "severe enough to interfere with attention and concentration need to perform even simple work tasks." (Id. at 273)

5

Dr. Maged, however, determined that plaintiff could tolerate a job involving moderate stress. (Id.) Dr. Maged's RFC assessment further listed that plaintiff could sit at one time for more than two hours and that he could stand at one time for one hour. (Id.) In a total eight hour work day, plaintiff could stand and walk for less than two hours and he could sit for at least six hours. (Id. at 274) Plaintiff, according to Dr. Maged, would require unscheduled thirty-minute breaks during an eight hour work day. (Id.) During prolonged sitting periods, plaintiff should elevate his legs at knee level seventy-five percent of the time. (Id.) He could occasionally lift and carry ten pounds and could only rarely climb ladders. (Id.) Plaintiff does not have any significant limitations on repetitive reaching and fingering. (Id.) In addition, plaintiff should avoid temperature extremes, wetness, cigarette smoke, perfumes, soldering fluxes, solvents, cleaners, fumes, odors, gases, and chemicals. (Id. at 275) Dr. Maged opined that plaintiff's impairments and treatments would result in absences of more than four days per month. (Id.) Dr. Maged added that plaintiff's diabetes, chronic lung disease from asthma and sinusitis caused him fatigue and would affect his ability to work a regular job on a sustained basis. (Id.)

### 3. Dr. Luis M. Garcia and Dr. Anthony Caristo

Dr. Luis M. Garcia ("Dr. Garcia"), a podiatrist, treated plaintiff from July 2004 to June 2005. (Id. at 294, 359-63) He diagnosed plaintiff with "peripheral neuropathy in stocking glove distribution [in the] bilateral lower extremities," and "a [d]ecrease in light touch, vibratory and proprioception." (Id.) In October 2004, Dr. Garcia recommended that plaintiff start a walking exercise program to help alleviate his allergies and reduce his weight. (Id. at 363-67) The record shows that plaintiff's weight increased from 220

6

pounds to 235.6 pounds from September 10, 2003 to February 21, 2006. (Id. at 153, 375) Dr. Garcia noted in three different appointment records, from April 12, 2005 to November 30, 2005, that plaintiff did not start the recommended walking exercise program. (Id. at 363-67) In a treatment record dated November 30, 2005, Dr. Garcia wrote: "Yelled at patient to start [his] walking program, join some sort of group to get out of the house. He was a workaholic who . . . needs to get involved." (Id. at 366)

On March 15, 2004, Dr. Anthony Caristo ("Dr. Caristo") examined plaintiff's right foot at the Christiana Care Hospital for pain and swelling. Dr. Caristo stated that plaintiff could perform a sedentary job including sitting, writing, or working at a desk, but not activities such as standing, walking, lifting, carrying or traveling. (Id. at 282)

### 4. Dr. Joseph Ramzy, Dr. David Wien and Dr. Mark Jones

Plaintiff has a fifteen year history of allergies, including chronic cough with clear mucous, recurrent sinusitis and asthma. (Id. at 295-96) On March 8, 2004, Dr. Joseph Ramzy ("Dr. Ramzy"), an otolaryngologist,[11] evaluated plaintiff and diagnosed him with non-allergic rhinitis.[12] (Id. at 284) On March 17, 2004, a computed tomography ("CT") scan was performed on plaintiff's sinuses and found "mild mucosal thickening of the bilateral maxillary antra." (Id. at 332) In reviewing the CT scan, Dr. Ramzy diagnosed "minimal sinusitis." (Id. at 333)

On July 29, 2004, Dr. David P. Wien ("Dr. Wien"), an allergy immunologist, evaluated plaintiff and diagnosed him with allergic rhinitis and asthma. (Id. at 296) Dr.

---

[11]An otolaryngologist is physician who specializes in the ear, nose, and throat.

[12]Rhinitis is the irritation and inflammation of some internal areas of the nose.

7

Wien reported that plaintiff had abnormal pulmonary function tests resulting in forced expiratory volume in one second ("FeV1")[13] test of 61% and forced vital capacity ("FVC")[14] test of 56%. (Id.) On August 6, 2004, Dr. Wien examined plaintiff and found his ears clear, nose mildly congested, throat without erythema, and lungs clear with no wheezing. (Id. at 335) Plantiff's FVC test was 51%, and the test report printout read: "[i]nterpretation: [m]oderate [s]evere [r]estriction." (Id. at 348) In addition, Dr. Wien noted that the prescriptions Advair and Nasacort did not seem to alleviate plaintiff's post-nasal drip and coughing and he recommended the prescriptions Astelin and Zyrtec to plaintiff. (Id. at 20, 335) If these were not successful, Dr. Wien then recommended immunotherapy. (Id. at 335) Moreover, plaintiff was found sensitive to molds, tree, ragweed, grass and weeds on the intradermal test, but was negative on the scratch test. (Id.)

### 5. Dr. Paula Ko

Dr. Paula Ko ("Dr. Ko"), an eye specialist, examined plaintiff on April 19, 2004 and diagnosed him with the formation of early cataracts in both eyes, and "moderate [to high risk of] non-proliferative diabetic retinopathy [("NPDR")] in both eyes." (Id. at 135-36) In a subsequent eye exam on June 10, 2005, Dr. Ko recorded that plaintiff's NPDR and cataracts had improved and were a mild risk. (Id. at 328)

### 6. State agency physicians

---

[13]The forced expiratory volume in one second test is the amount of air one can exhale in one second.

[14]The forced vital capacity test is the amount air one is able to exhale after full inspiration.

Two state agency non-examining physicians reviewed all evidence in plaintiff's file and completed a RFC assessment. (Id. at 285-94, 297-304) On April 6, 2004, the first medical physician determined that plaintiff had a sedentary RFC. (Id. at 286) Specifically, plaintiff was able to: (1) occasionally lift or carry twenty pounds; (2) stand or walk at least two hours in an eight hour workday, (3) sit six hours in an eight hour workday; and (4) has no restriction for push or pull hand or foot movements. (Id.)

On October 13, 2004, the second medical physician gave the same assessment as the first; but also noted that plaintiff should avoid extreme heat and cold, wetness, humidity, fumes, odors, dusts, gases, poor ventilation and hazards. (Id. at 301) The second medical physician concluded that plaintiff had a sedentary RFC and he stated that plaintiff's claimed impairments were only "partially credible." (Id. at 304)

Prior to October 20, 2004, Dr. Aydin Bill ("Dr. Bill"), a psychiatrist, examined plaintiff based on a referral from the Social Security Administration "for a psychiatric evaluation regarding his disability application." (Id. at 305) Dr. Bill determined that plaintiff was depressed and diagnosed him with depressive disorder. (Id. at 307) Dr. Bill, however, noted that plaintiff's "facial expressions did not appear depressed and he smiled while talking." (Id. at 306) "He is not motivated to do anything," and "[h]e feels bad all the time." (Id.) Plaintiff "is alert, fully oriented as to time, place and person," and his "memory is judged to be well preserved for recent and remote events." (Id. at 307) Dr. Bill further opined that "he does not present himself as a depressed person but he is also on 300 mg Wellbutrin at the present time and he is pretty much depressed [more] than he shows to be." (Id.)

In a supplemental RFC assessment questionnaire, dated October 19, 2004, Dr.

9

Bill listed plaintiff's moderately severe symptoms as follows: (1) the ability to relate to people; (2) the ability to attend meetings, work around the house, and socialize with neighbors; (3) a constriction of interest; (4) the performance of complex tasks; (5) the performance of varied tasks. (Id. at 311-12) A state agency medical physician reviewed plaintiff's psychiatric evaluation and determined that his only functional limitation was mild difficulty in maintaining concentration, persistence, or pace. (Id. at 323) The medical physician further concluded that, while plaintiff showed some mild symptoms, his impairment was not severe. (Id. at 325)

## C. Hearing Before ALJ

In the ALJ's May 22, 2006 decision in favor of defendant, she determined that the medical evidence supported the finding that plaintiff suffered from severe "type I diabetes with diabetic neuropathy, asthma and allergic rhinitis." (Id. at 17) The ALJ further found plaintiff's "nonsevere impairments [to be] depression, hypertension, and arthritis." (Id. at 18) Specifically, the ALJ found that plaintiff's global assessment functioning ("GAF")[15] score of seventy indicated mild depression and that his hypertension and arthritis were controlled with medication. (Id. at 18, 307-08) Plaintiff's treating physician,[16] Dr. Maged, prescribed him an anti-depressant medication, but plaintiff had not sought treatment from a psychiatrist or therapist for his depression. (Id. at 419-22) In addition, "the state agency medical consultant determined that [plaintiff] had only mild limitations in the area of concentration, persistence or pace and no other

---

[15]The Global Assessment of Functioning is a numeric scale (0 through 100) used to access the social, occupational and psychological functioning of adults.

[16]The ALJ acknowledged Dr. Maged as a treating physician. (D.I. 7 at 20)

10

limitations." (Id. at 18, 323) Plaintiff testified that he can "use his hands normally, but generally avoids raising his arms above shoulder height." (Id. at 18, 411-12) The ALJ concluded that plaintiff's non-severe impairments, as identified above, were not severe because they were "either controlled with treatment or cause no significant vocational limitations." (Id. at 18)

The ALJ found that plaintiff had the RFC to perform sedentary work, including the ability to "lift or carry twenty pounds occasionally and ten pounds frequently, stand and walk for two hours during an eight hour work day and sit for six hours during an eight hour work day." (Id.) Plaintiff, however, must avoid "moderate exposure to cold, fumes, odors, dust, gases, poor ventilation, and moving hazards, and perform posturals only occasionally." (Id.) Plaintiff also was limited to "simple unskilled work due to medication side effects and fatigue." (Id.) Considering plaintiff's age, education, work experience and RFC, "there are jobs in the national economy that plaintiff can perform." (Id. at 22) The VE testified that, based on plaintiff's limitations, he is able to perform the requirements of "representative occupations such as charge account clerk, addressor, and call out operator." (Id.) Specifically, there are "3,000 jobs regionally and 162,000 jobs nationally for charge account clerk, [and there are] 1,300 jobs regionally and 5,700 jobs nationally for addressor, and 5,000 jobs regionally and 318,000 jobs nationally for call out operator." (Id. at 22, 424-25)

The ALJ determined that plaintiff's impairments could produce his alleged symptoms, but that plaintiff's statements describing the "intensity, duration and limiting effects of these symptoms [were] not entirely credible." (Id. at 19) Plaintiff testified that he could no longer work due to diabetes, allergies, asthma, coughing and fatigue. (Id.

11

at 403) The ALJ noted that plaintiff stopped working in 2002, when his employer closed the facility and relocated. (Id. at 401) He searched for a new job for twelve months but was unsucessful. (Id. at 401-02) Plaintiff further testified that he used five different medications for asthma and allergies. (Id. at 408) Plaintiff stated that he can walk, stand or sit for approximately one hour before he must move around to relieve shoulder pain or stiffness. (Id. at 412-14) Plaintiff also alleged that if he walked twenty minutes then he might have to spend the next three to four hours laid up in bed because he would be so worn out. (Id. at 413) In addition, plaintiff testified that he has problems climbing the stairs at least twice per day. (Id. at 408) Plaintiff stated that he can bend, stoop and momentarily lift ten pounds, but he cannot squat or kneel. (Id. at 414-15)

Plaintiff further testified that chemicals and fumes cause him allergy and asthma problems. (Id. at 416) While living with his parents, he could drive (id. at 396), care for his personal hygiene, prepare simple meals, keep his bedroom clean, occasionally do laundry, and could socialize on a limited basis (id. at 415-17). Plaintiff represented that he was 5'10" tall and approximately 236 pounds. (Id. at 395) The ALJ also considered the evidence provided by Dr. Lenhard, Dr. Wein, Dr. Maged, Dr. Garcia and state agency medical physicians in assessing plaintiff's credibility and RFC. (Id. at 19-21)

The ALJ stated that she considered the treating source opinion of Dr. Lenhard and found that it was not supported by the medical evidence. (Id. at 21) The ALJ explained that her decision to deny plaintiff disability benefits was based on the stability of plaintiff's medical condition since December 2004 and plaintiff's ability to handle low stress sedentary work. (Id.) Furthermore, Dr. Lenhard's opinion that plaintiff should not work was not consistent with medical evidence and plaintiff would not need dialysis for

12

a number of years. (Id.) Moreover, plaintiff's foot problem was resolved by August 2004 and Dr. Lenhard noted that plaintiff's diabetes was stable, including his retinopathy, neuropathy, and nephropathy. (Id.) Dr. Lenhard further found that, on February 21, 2006, plaintiff had no new diabetic problems and his diabetic control "remains excellent." (Id.) For the above reasons, the ALJ found plaintiff "not disabled." (Id. at 23)

## III. STANDARD OF REVIEW

Findings of fact made by the ALJ are conclusive, if they are supported by substantial evidence. Accordingly, judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. See Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. See id. In other words, even if the reviewing court would have decided the case differently, the ALJ's decision must be affirmed if it is supported by substantial evidence. See id. at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 556 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. The inquiry performed is the threshold inquiry of determining whether

13

there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51, (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence–particularly certain types of evidence (e.g., that offered by treating physicians)–or if it really constitutes not evidence but mere conclusion." See Brewster v. Heckler, 786 F.2d 581, 584 (3d Cir.1986) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 1990).

## IV. DISCUSSION

### A. Disability Determination Process

Eligibility for disability insurance benefits under the Social Security Act is

14

conditioned on compliance with all relevant requirements of the statute. See 42 U.S.C. § 423(a). The Social Security Administration is authorized to pay disability insurance benefits to persons who are "disabled." 42 U.S.C. § 423(a)(1)(E). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." See 42 U.S.C. § 423(d)(2)(A); Barnhart v. Thomas, 540 U.S. 20, 21-22 (2003). To determine disability, the ALJ uses a five-step sequential analysis. See 20 C.F.R. § 404.1520; Plummer v. Apfel, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the ALJ will not review the claim further. 20 C.F.R. § 404.1520(a)(4).

At step one, the ALJ must determine whether the claimant is engaged in any substantial gainful activity. See 20 C.F.R. § 404.1520(a)(4)(i) (mandating a finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the ALJ to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. See 20 C.F.R. § 404.1520(a)(4)(ii) (requiring finding of not disabled when claimant's impairments are not severe). If claimant's impairments are severe, the ALJ, at step three, compares the claimant's impairments to a list of impairments (the "listing") that are presumed severe enough to preclude any gainful

work.[17] See 20 C.F.R. § 404.1520(a)(4)(iii); Plummer, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. See 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. See 20 C.F.R. § 404.1520(d).[18]

At step four, the ALJ determines whether the claimant retains the RFC to perform her past relevant work. See 20 C.F.R. § 404.1520(a)(4)(iv) (stating a claimant is not disabled if able to return to past relevant work); Plummer, 186 F.3d at 428. "The claimant bears the burden of demonstrating an inability to return to her past relevant work." Plummer, 186 F.3d at 428. If the claimant is unable to return to her past relevant work, step five requires the ALJ to determine whether the claimant's impairments preclude her from adjusting to any other available work. See 20 C.F.R. § 404.1520(g) (mandating that a claimant is not disabled if the claimant can adjust to other work); Plummer, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. See Plummer, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical

---

[17]Additionally, at steps two and three, claimant's impairments must meet the duration requirement of twelve months. See 20 C.F.R. §§ 404.1520(a)(4)(ii-iii).

[18]Prior to step four, the ALJ must assess the claimant's RFC. See 20 C.F.R. § 404.1520(a)(4). A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment[s]." Fargnoli v. Massanari, 247 F.3d 34, 40 (3d Cir. 2001) (quoting Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000)).

16

impairments, age, education, past work experience, and [RFC]." Id. This determination requires the ALJ to consider the cumulative effect of the claimant's impairments and a vocational expert is often consulted. Id.

## B. Whether the ALJ's Decision is Supported by Substantial Evidence

Plaintiff requests remand to defendant with instructions to: "(1) properly consider the opinions of [plaintiff's] treating physicians, Dr. Lenhard and Dr. Maged; (2) find that his obesity is a severe impairment; (3) reassess his [RFC]; (4) obtain new vocational testimony and pose a complete question to the VE; and (5) issue a new decision based on substantial evidence and proper legal standards." (D.I. 10 at 32)

### 1. The ALJ's Treatment of Medical Evidence

An ALJ, in her treatment of medical evidence, must: (1) consider and determine the appropriate amount of weight to give medical evidence; and (2) explain any rejection of medical evidence. See Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981). More specifically, the regulations state that a treating source's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."[19]  20 C.F.R. § 404.1527(d)(2); see Fargnoli, 247 F.3d at 43. Further, when an ALJ's decision contradicts the treating physician's opinion, then she must "give some reason for discounting the evidence she rejects." Plummer, 186 F.3d at 429. "In the absence of such an indication, the reviewing court cannot tell if

---

[19]To determine a treating source opinion's weight, the ALJ must weigh all evidence and resolve any material conflicts. See Morales v. Apfel, 225 F.3d 310, 317-18 (3d Cir. 2000); see also 20 C.F.R. § 404.1527(d).

17

significant probative evidence was not credited or simply ignored." Cotter, 642 F.2d at 705 (3d Cir. 1981).

### a. Dr. Lenhard

In the case at bar, plaintiff argues that the ALJ erred because her reasons for not affording Dr. Lenhard's opinion controlling weight were not based on substantial evidence. (D.I. 10 at 18) Specifically, plaintiff asserts that Dr. Lenhard's conclusions were not inconsistent with the other evidence of record. (Id.) The court disagrees and finds that, in this regard, the ALJ's determination is supported by substantial evidence in the record. In particular, Dr. Lenhard's own records contain evidence inconsistent with his opinion that plaintiff was unable to work. An August 11, 2004 letter, composed by Dr. Lenhard, noted that plaintiff's foot was healed completely and that his diabetes was under reasonable control. (Id. at 146) Dr. Lenhard also noted that plaintiff's retinopathy and neuropathy were stable. (Id.) Although Dr. Lenhard stated that he **supported** plaintiff "in not working" and "in his ability to obtain social security benefits" because multiple diabetic complications and impending hemodialysis would affect his ability to work (id. at 345), he also stated that plaintiff would not need dialysis until years in the future. (Id. at 344-45) Dr. Lenhard's RFC assessment indicated that plaintiff was capable of tolerating low stress jobs.[20] (Id. at 143) On February 21, 2006, Dr. Lenhard noted that plaintiff's diabetic control remained excellent with no new complaints. (Id. at 375-76)

---

[20]Dr. Lenhard left the RFC assessment questionnaire incomplete because, in his own opinion, it was not within his medical expertise to determine plaintiff's ability to sit, stand, lift, carry, and perform postural functions. (Id. at 143-45)

18

In addition to Dr. Lenhard's records, there is other medical evidence in the record that supports the ALJ's decision not to afford Dr. Lenhard's opinion controlling weight. On April 19, 2004, Dr. Ko recorded that plaintiff's NPDR and cataracts improved and were a mild risk. (Id. at 328)  In addition, Dr. Maged, as indicated in his RFC assessment, found that plaintiff could tolerate moderate stress jobs.[21]  (Id. at 273)  Dr. Caristo also noted that plaintiff could perform a sedentary job. (Id. at 282)  Based on the above, there exists substantial objective medical evidence in the record, contrary to Dr. Lenhard's opinion, such that the ALJ need not have afforded Dr. Lenhard's opinion controlling weight. See Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir. 1988); see also 20 C.F.R. § 404.1527(d).

Plaintiff also argues that the ALJ committed reversible error by failing to explain why "great weight" was not given to Dr. Lenhard's opinion. (D.I. 10 at 18)  Specifically, plaintiff contends that the ALJ failed to cite to any contrary medical evidence to rebut Dr. Lenhard's assessment as required by Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000). The court finds that the ALJ, in her opinion, did consider the treating source opinion. (See D.I. 7 at 21)  In particular, the ALJ stated that Dr. Lenhard's opinion was "not supported by the medical evidence." The ALJ, in choosing to reject the treating physician's assessment, may not make speculative inferences from medical reports nor rely on her own lay opinion. See Plummer v. Apfel, 186 F.3d at 429; Frankenfield, 861 F.2d at 408; Kent v. Schweiker, 710 F.2d 110, 115 (3d Cir. 1983). Here, however, the

---

[21]As discussed infra, it is unclear what weight the ALJ afforded to Dr. Maged's opinion; nevertheless, Dr. Maged's statement could support the ALJ's determination that Dr. Lenhard's opinion was inconsistent with other objective evidence of record.

ALJ adequately explained her reasons for not affording Dr. Lenhard's opinion adequate
weight, identifying the same reasons as discussed above. (See D.I. 7 at 21)

### b. Dr. Maged

Plaintiff argues that the ALJ committed reversible error in failing to provide
reasons for rejecting Dr. Maged's opinion. (D.I. 10 at 18) "The ALJ is not required to
supply a comprehensive explanation for the rejection of evidence; in most cases, a
sentence or short paragraph would probably suffice." Cotter, 650 F.2d at 482.
Although the ALJ summarized Dr. Maged's medical opinion in her decision, she did not
explain either the reasons why it was or was not adopted nor the weight it was afforded.
(Id. at 20) Moreover, the ALJ identified Dr. Maged as a treating physician. See 20
C.F.R. § 404.1527(d)(2) (stating that, generally, more weight is given to treating source
opinions); (D.I. 7 at 20) Because it is unclear to the court if, and to what extent, the ALJ
considered Dr. Maged's opinion, especially when considered in conjunction with Dr.
Lenhard's opinion, the court remands to the administrative level for clarification of this
issue.[22]

---

[22]The ALJ found that plaintiff had the RFC to perform sedentary work, including
the ability: (1) to lift or carry twenty pounds occasionally and ten pounds frequently; (2)
to stand and walk for two hours and sit for six hours during an eight hour work day; and
(3) to perform posturals only occasionally. (D.I. 7 at 19) Conversely, Dr. Maged opined
that plaintiff's medical conditions caused him fatigue and would affect his ability to work
a regular job on a sustained basis. (Id. at 272-75) Specifically, Dr. Maged stated that
plaintiff: (1) could lift or carry ten pounds occasionally; (2) stand and walk for less than
two hours and sit for six hours during an eight hour work day; and (3) must take
unscheduled thirty minute breaks and elevate his legs at knee level seventy-five
percent of the time during periods of prolonged sitting. (Id.); see also 20 C.F.R. §
404.1527(d)(2) ("When we do not give the treating source's opinion controlling weight,
we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as
the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight
to give the opinion.")

## 2. The ALJ's treatment of plaintiff's "obesity"

Plaintiff argues that the ALJ erred as a matter of law by failing to designate plaintiff's obesity as a severe impairment and by failing to consider it in combination with plaintiff's other impairments. (D.I. 10 at 22-27) In particular, plaintiff contends that such a consideration of plaintiff's obesity would have affected the outcome of the ALJ's RFC determination that plaintiff could perform sedentary work. (Id. at 25) At the outset, the court notes that plaintiff did not list obesity on his disability application form nor did he testify that he was obese at his hearing before the ALJ. Notwithstanding this failure, the ALJ is required to consider all impairments that plaintiff raises or submits into the record.[23] See Rutherford v. Barnhart, 399 F.3d 546, 552-53 (3d Cir. 2005) (quoting Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004) (per curiam)). In the case at bar, the court finds that "the references to his weight in his medical records were likely sufficient to alert the ALJ to the impairment."[24] See id.; (D.I. 7 at 41-46)

Remand on the sole ground to reconsider obesity, however, is only required

_____

[23]Step two of the five step analysis requires the ALJ to determine if a claimant's impairment is severe or is severe in combination with other impairments. See 20 C.F.R. § 404.1520(a)(4)(ii).

[24]In the case at bar, the ALJ stated that plaintiff's treatment notes reflect that plaintiff's weight and inactive lifestyle contributed to his medical conditions; however, the ALJ did not consider whether plaintiff's obesity was an impairment. (See D.I. 7 at 20) Plaintiff testified that his height was 5' 10" and approximate weight was 236 pounds. (Id. at 395) Dr. Lenhard and Dr. Maged noted in their medical records that plaintiff was obese. (Id. at 147, 150, 153, 156, 338-41, 375) Dr. Jones stated that it was "possible that most of his dyspnea on exertion [was] related to his relative obesity, significant inactivity and mild obstructive deficit likely related to asthma." (Id. at 347, 357) Dr. Garcia recommended a walking exercise program to help plaintiff alleviate his asthma and lose weight. (Id. at 363-67)

when it would affect the outcome of the case.[25] Rutherford, 399 F.3d at 552-53; cf. Demiranda v. Barnhart, No. Civ. A. 04-4199, 2005 WL 1592950, at *1-2 (E.D. Pa. July 05, 2005) (remanding because obesity affected her ability to work, and limited her ability to function).

In the case at bar, the ALJ did not explain if or how plaintiff's alleged obesity figured into her determination at any point of the five step process, nor did she adopt the recommendations of doctors who were aware of plaintiff's obesity;[26] consequently, the court remands to the ALJ for consideration of whether plaintiff is obese and, if so, how consideration of this impairment affects the other steps of the disability determination sequence. See Cooper v. Comm'r of Soc. Sec., 268 Fed. Appx. 152, 156 (3d Cir. 2008) (non-precedential) (quoting Soc. Sec. Rul. 02-1p, 2000 WL 628049, at *5 (Sept. 12, 2002) (hereinafter "SSR 02-1p")); see also SSR 02-1p (illustrating obesity's relevance at each step of the disability determination process). As these considerations may affect the outcome of the case, remand is appropriate.[27]

### 3. Plaintiff's testimony and witness statements

---

[25]Factors for remand that could affect the outcome of the case include whether obesity, alone or in combination with other conditions, impairs plaintiff's ability to work, or contributes to any functional limitations. For example, Drs. Jones and Garcia indicated that plaintiff's obesity potentially worsened his asthma, which the ALJ determined was severe. (D.I. 7 at 347, 357, 363-67)

[26]See Rutherford, 399 F.3d at 552-53 (quoting Skarbek, 390 F.3d at 504) (finding remand not required, in part, because the ALJ adopted limitations suggested by doctors who were aware of claimant's obesity, thus, obesity factored indirectly into the ALJ's decision).

[27]In addition, the court notes that it is remanding for further proceedings on other issues, and not solely on the grounds of obesity. Cf. Rutherford, 399 F.3d at 552-53.

Plaintiff also argues that the ALJ erred in her treatment of plaintiff's testimony and several witness's statements. Specifically, plaintiff contends that error exists because: (1) the ALJ did not provide a specific rationale for rejecting plaintiff's testimony; and (2) the ALJ failed to discuss several witness statements provided by plaintiff describing his limitations. (D.I. 10 at 27)

## a. Plaintiff's testimony

The relevant regulations provide, with respect to an ALJ's determination regarding a claimant's credibility, that "the decision contain 'specific reasons' for [the] credibility finding, which is supported by the evidence in the case record, and 'must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR-96-7p, available at 1996 WL 374186, at *2. In determining whether plaintiff's impairments were severe, the ALJ discussed claimant's testimony with respect to his alleged impairments of depression, hypertension and arthritis. (D.I. 7 at 18) The ALJ further explained that her determination that these impairments were non-severe was supported because these impairments "are either controlled with treatment or cause no significant vocational limitations." (Id.) In this regard, the ALJ committed no error.

## b. Other witnesses

"[T]he ALJ must also consider and weigh all of the non-medical evidence before him." Burnett v. Commissioner of Social Security Administration, 220 F.3d 112, 122 (3d Cir. 2000). The ALJ must consider whether opinions from non-medical sources, such

as "spouses, other relatives, friends, employers, and neighbors," are consistent with the objective medical evidence. Social Security Ruling 06-03P, 2006 WL 2329939, at *3, 6 (S.S.A.). "Although allegations of pain and other subjective symptoms must be consistent with objective medical evidence, the ALJ must still explain why [s]he is rejecting the testimony." Burnett, 220 F.3d at 122 (internal citations omitted).

In the instant case, the ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms but that the claimant's statements concerning the intensity, duration, and limiting effects of these symptoms [were] not entirely credible." (D.I. 7 at 19) The ALJ does not mention nor provide any reasons for rejecting statements from plaintiff's family and friends, including those of Dorothy Eskridge (mother), Justine Gilbert (uncle), Christine Lynn (friend), Warren Thompson (friend), and Deborah Apostolico (brother). (See id. at 126-30) Upon remand, the ALJ must consider whether the statements of plaintiff's family and friends are consistent with the objective medical evidence and, if the ALJ rejects such evidence, provide reasons for so doing. See Burnett, 220 F.3d at 122.

### 4. Hypothetical

Plaintiff argues that the hypothetical question that the ALJ relied upon in finding that work existed for plaintiff in the national economy was deficient as a matter of law. (D.I. 10 at 30) The ALJ's RFC determination "must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). Having determined that the ALJ must further explain her credibility determinations concerning Dr. Maged's opinion, the

24

additional witness testimony, and how plaintiff's obesity factors into the disability determination, the court is unable to conclude whether substantial evidence exists to support the hypothetical used by the VE. The ALJ must re-visit this issue upon remand, if necessary.

## V. CONCLUSION

For the reasons stated, plaintiff's motion for summary judgment is granted to the extent that the case is remanded for further proceedings consistent with this opinion. Defendant's motion for summary judgment is denied. An appropriate order shall issue.